ORIGINAL

FILED
HARRISBURG

OCT 1 0 2000

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN RICHARD JAE, | : |
| Plaintiff | : Civil Action No. 1:00-CV-1090 |
| v. | : (Chief Judge Rambo) |
| DR. ROBERT CLARK, et al., | : (Magistrate Judge Smyser) |
| Defendants | : |

**CORRECTIONS DEFENDANTS' BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
AND/OR AN EXPEDITED PRELIMINARY INJUNCTION**

INTRODUCTION

Plaintiff has moved for a temporary restraining order and a preliminary injunction ordering his transfer from the restricted housing unit ("RHU") at the State Correctional Institution at Camp Hill ("SCI-Camp Hill"). *See* Motion for a Temporary Restraining Order and/or an Expedited Preliminary Injunction ("Motion"), ¶ 2. He seeks to be transferred to a state hospital or a special needs unit. *Id.* He also seeks an order prohibiting his transfer to any special management unit operated by the Pennsylvania Department of Corrections. *Id.*, ¶ 1. The sole

basis for plaintiff's Motion is a self-serving, declaration filed along with his motion.

Plaintiff's Motion should be denied for a number of reasons. First, he is not entitled to maintain this suit. Plaintiff is not entitled to the *in forma pauperis* status and sought *in forma pauperis* status without informing the court of his numerous frivolous filings and the rulings by this Court revoking plaintiff's *in forma pauperis* status in other cases. The Defendants moved to revoke plaintiff's *in forma pauperis* status on the basis of his numerous frivolous filings and the rulings by this Court revoking plaintiff's *in forma pauperis* status in other cases. Plaintiff does not possess the funds to pay the filing fee in this case. Absent his improper *in forma pauperis* application, plaintiff would not have been able to file this suit. It would be an abuse of the court's power to grant his Motion in a suit that he could not have filed in the first place absent plaintiff's improper *in forma pauperis* application. His *in forma pauperis* status should be revoked and his suit, along with his Motion, should be dismissed for failure to pay the filing fee for this action in full.

Second, plaintiff cannot obtain the relief he seeks from the defendants. The injunction he seeks is essentially against the Pennsylvania Department of Corrections and SCI-Camp Hill, which are not defendants in this action. Third, the relief plaintiff seeks is based upon a dispute over the course of his treatment. Inmates are not permitted in the guise of a suit under 42 U.S.C. § 1983 to second-guess the medical treatment they are receiving. Granting the relief sought by plaintiff would improperly inject this Court into the medical treatment process and displace the judgments of medical professionals based upon nothing more than the uneducated opinions of an inmate who admits he is mentally ill. Fourth, plaintiff's suit, in the guise of a medical treatment claim, is really a challenge to the misconduct determinations made by SCI-Camp Hill. Those

determinations are not a proper subject of a suit under 42 U.S.C. § 1983. Finally, the relief sought by plaintiff's Motion is inconsistent with the accepted law that an inmate has no right to placement in a particular institution or portion thereof.

As shown below, plaintiff cannot meet the heavy burden he bears to establish the four elements required for the issuance of a temporary restraining order or a preliminary injunction. For the reasons set forth above and below, his Motion should be denied.

## PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that he is suffering from mental illness and he needs to be confined in a psychiatric facility, but that Dr. Clark refuses to commit plaintiff to such a facility or provide plaintiff with anti-psychotic medicine. Motion, ¶s 8-10. Plaintiff next alleges that he has been confined in the RHU since November 19, 2000, for violations of prison rules, but that his violations are a product of his mental illness. *Id.*, ¶s 11-12. Plaintiff claims the Corrections Defendants, Dragovich, Palakovich, Novotney, Kazor and Andrade, were aware of plaintiff's mental illness, but did not release him from the RHU. *Id.*, ¶ 12.

Plaintiff alleges that he has a lengthy history of mental illness and was diagnosed by unnamed persons as having a borderline personality disorder, organic personality disorder and intermittent explosive disorder with poor impulse control. *Id.*, ¶ 16. He claims that an unnamed, prison counselor told him in 1998, that plaintiff was considered a "mental health case." *Id.*, ¶ 14. He further claims that 34 years ago he suffered a head trauma and that in 1992 or 1993, a Dr. Scott Burnstein attributed plaintiff's criminal conduct and violations of prison rules to a chemical imbalance resulting from this head trauma. *Id.*, ¶ 19. Plaintiff also asserts that a Dr. Christine

3

Martone confirms plaintiff's mental illness. *Id.* Plaintiff also alleges that on June 6, 2000, he was sent to the State Correctional Institution at Waymart ("SCI-Waymart") for a mental health evaluation, he was returned to the RHU at SCI-Camp Hill on July 18, 2000, he has not seen the official report, but was informed that SCI-Waymart evaluators recommended that plaintiff be placed in a special management unit ("SMU"). *Id.*, ¶s 17-18. Plaintiff claims his irreparable injury is from not being treated for his mental illness and being confined in the RHU under conditions which include inadequate or broken plumbing, insects, rodents, clothing which is too small, delays in receiving clean linen, verbal abuse, inadequate ventilation, and excessive heat. *Id.*, ¶ 20.

## CORRECTIONS DEFENDANTS' FACTUAL RESPONSE

The Corrections Defendants do not dispute that plaintiff is confined in the RHU at SCI-Camp Hill, nor that he has been confined there since November of 1999. Nor do the Correction Defendants dispute that plaintiff's confinement in the RHU is the result of his repeated violations of prisons rules including a history of assaults on and threats to staff members. In fact, Corrections Defendants even agree with plaintiff that his recent confinement in the RHU has not produced the desired result, *i.e.*, plaintiff's compliance with prison rules so that he can return to custody within the general population of a correctional institution.

What the Corrections Defendants do dispute is plaintiff's self-diagnosis of his condition, his unsupported allegations concerning his mental health treatment, his claims that his refusal to comply with prison rules are beyond his control and the product of chemical imbalances resulting from injuries suffered over thirty years ago. Finally, and most importantly, the Corrections Defendants object to plaintiff's attempt to interpose this Court into custody decisions by the

4

Pennsylvania Department of Corrections ("Department"). Plaintiff's allegations in this regard are unsupported nonsense reflecting his desperate effort to avoid transfer to a special management unit chosen by the Department which it considers, on the basis of its experience and the exercise of its discretion in managing the Commonwealth's prisons, to be the best location and environment for plaintiff.

As this Court is well aware from its experience with prisoner litigation arising out of the Commonwealth's prisons, disciplinary custody in a RHU is imposed on an inmate following a determination that he has violated a prison rule of sufficient magnitude to justify such confinement. For example, disciplinary custody is a typical punishment for assaults by inmates or threats of assaults. This confinement is used as a means to discourage future prison violations by means of classic, negative reinforcement. Disciplinary custody is imposed as a deterrent because safety of both inmates and staff is a primary concern of the Department. Disciplinary custody is for a set period of time, for example thirty days, and results in a reduction of the inmate's privileges. Once the time has been served, the inmate is, barring any new developments, returned to the general population with the hope that the experience in disciplinary custody will deter future violations of prison rules.

In April of this year, the administrators of SCI-Camp Hill determined that plaintiff's continued confinement in the RHU was not achieving the hoped-for result. Plaintiff's confinement in the RHU had not produced any significant change and plaintiff, even while confined in the RHU, continued to violate prison rules and incur additional disciplinary custody time. *See* Exhibit 1 of Appendix to this brief containing a selection of misconducts by plaintiff. Indeed, plaintiff's violations were so constant in their occurrences, it appeared that he would be

5

confined in the RHU for years to come. *See* Exhibit 2 of Appendix to this brief containing a selection of misconduct sanctions incurred by plaintiff.

A committee was convened consisting of plaintiff's counselor, a corrections officer familiar with plaintiff, a psychologist, the RHU manager, the inmate program manager and a mental health coordinator. *See* DC-46, attached as Exhibit 3 in the Appendix to this brief. This committee determined that plaintiff should be transferred to the Special Assessment Unit at the State Correctional Institution at Waymart ("SCI-Waymart") for a psychiatric evaluation. "Mr. Jae has been referred from his home institution, namely SCI Camp Hill for a complete psychiatric/psychological evaluation." Initial Psychiatric Evaluation by Dr. Mahmood Rahman, M.D., Consulting Psychiatrist, SCI-Waymart, Special Assessment Unit, dated June 6 and signed on June 30, 1999, p. 1.[1] "Mr. Jae believes that he has a chemical imbalance in his brain and this, he feels, is the result of a head injury which occurred when he was 6 years old." *Id.* This transfer was designed to specifically assess plaintiff's claim that his frequent misconducts were the product of his mental illness. Jae "stated 'a lot of misconducts are related to my mental illness' ...." *Id.* "He [Jae] stated that 'when I get made the chemical imbalance gets activated.'" *Ibid. See also* Exhibit 3.

As shown below, every supposed, medical basis for plaintiff's Motion was rejected by psychiatric and psychological professionals who evaluated plaintiff over a 45 day period within the confines of a specialized unit within the Department designed precisely for such issues. This Court should be extremely reluctant to overturn such determinations based upon nothing more

---

1 Certain portions of the plaintiff's records from SCI-Waymart are marked confidential. Non-confidential portions of the documents are being quoted in this brief. A copy of the confidential documents can be submitted to the court for an *in camera* review. In order to protect the confidentiality of these documents and the candor of the author of such documents, the

6

than plaintiff's dispute as to the course of his treatment. *See generally, Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979).

A portion of the SCI-Waymart is the devoted to confinement of seriously, mentally-ill prisoners who for a variety of reasons cannot be housed at typical, correctional institutions. The staff of SCI-Waymart regularly deal with the mentally ill and it includes an unusually, large number of psychiatrists, psychologists and other mental health professionals. As part of its functions, the staff of SCI-Waymart make determinations as to the severity of an inmate's mental illness, whether inmates are suitable conditions for confinement at SCI-Waymart, and conversely whether it is more beneficial to house the inmate at another location within the Department. These evaluations are conducted by the Special Assessment Unit at SCI-Waymart, the unit to which plaintiff was transferred on June 6, 2000. *See* SCI-Waymart Admitting Assessment Note/Initial Assessment Plan, attached as Exhibit 4 in the Appendix to this brief.

Jae's suicide risk was evaluated. He was evaluated in connection with his transfer and the evaluation found no evidence of a risk. "He [Jae] also, at this time, denies any suicidal or homicidal ideation, intent, or plan." Initial Psychiatric Evaluation by Dr. Mahmood Rahman, M.D., Consulting Psychiatrist, SCI-Waymart, Special Assessment Unit, dated June 6 and signed on June 30, 1999, p. 1.[2] "The inmate has made numerous attempts at self mutilation in the past." *Id.*, p. 1. "I was unable to appreciate any serious suicide attempts." *Ibid.*

---

government documents privilege is asserted as to their full release.

[2] Another assessment of plaintiff's suicide potential was conducted prior to plaintiff's transfer to SCI-Waymart and it determined few indications (2 out of 13) of suicide risk. A copy of this confidential documents can be submitted to the court for an *in camera* review. In order to protect the confidentiality of this document and prevent the plaintiff from using information in the document to feign a suicide risk, the government documents privilege is asserted as to their full release.

7

Plaintiff was interviewed upon his admission, his mental status was evaluated, his past psychiatric history and records were reviewed, his past medical history was reviewed, and his past psychosocial history was reviewed. Initial Psychiatric Evaluation by Dr. Mahmood Rahman, M.D., Consulting Psychiatrist, SCI-Waymart, Special Assessment Unit, dated June 6 and signed on June 30, 1999, pp. 1-5. The staff at SCI-Waymart then set about to determine the cause for plaintiff's behavior and to determine whether there were any organic causes. "Psychology will initiate psychological testing which will certainly help delineate diagnostic etiologies for this inmate. *Id.*, p. 6. *See also* Exhibit 4 in the Appendix to this brief, Admitting Diagnosis Section.

Plaintiff was given psychological tests on June 9 and 14, 2000 as part of his evaluation at SCI-Waymart. *See* redacted portion of SCI-Waymart Special Assessment Unit, Psychology Department Testing attached as Exhibit 5 in the Appendix to this brief.[3] From these tests and other evaluations, a Comprehensive Treatment Plan was created with two primary goals: having plaintiff act in way that maintain the safety of himself and others, and having plaintiff comply with prison rules. *See* SCI-Waymart Special Assessment Unit, Comprehensive Treatment Plan attached as Exhibit 6 in the Appendix to this brief. Additional psychological tests were administered to plaintiff on June 28, 2000 and July 7, 2000. *See* redacted portion of SCI-Waymart Special Assessment Unit, Psychology Department Testing attached as Exhibit 7

---

3 This document is also confidential and can be submitted *in toto* to the court for an *in camera* review. In order to protect the confidentiality of this document and the candor of the author, and prevent the plaintiff from using information in the document to feign mental illness, the government documents privilege is asserted as to its full release.

in the Appendix to this brief.[4] Plaintiff was also regularly seen, interviewed and observed by the staff of the SCI-Waymart Special Assessment Unit.[5]

At the end of the assessment, plaintiff was diagnosed as not having organic sources for his behavior, *i.e.*, the experts at the SCI-Waymart Special Assessment Unit rejected plaintiff's contention that his behavior leading to misconducts was the result of a chemical imbalance stemming from prior trauma. *See* SCI-Waymart Special Assessment Unit (SAU) Discharge Instructions, dated July 13, 2000, Discharge Diagnosis Section, a copy of which is included as Exhibit 8 in the Appendix to this brief. The staff of the SAU rejected plaintiff's claim in this Motion that he should be transferred to a state hospital or special needs unit. In particular the SAU staff recommended that plaintiff be referred to a special management unit, the precise unit plaintiff seeks a prohibitory injunction against. *Id.*, Aftercare Plan (Recommendations, Section 2).

## ARGUMENT

I.  Plaintiff's Motion Should Be Denied
    Because He Improperly Sought In Forma Pauperis Status.

Plaintiff is not entitled to maintain this suit. Plaintiff is not entitled to the *in forma pauperis* status. He sought *in forma pauperis* status without informing the court of his numerous frivolous filings and the rulings by this Court revoking plaintiff's *in forma pauperis* status in

---

[4] This document is also confidential and can be submitted *in toto* to the court for an *in camera* review. In order to protect the confidentiality of this document and the candor of the author, and prevent the plaintiff from using information in the document to feign mental illness, the government documents privilege is asserted as to its full release.

[5] These activities are reflected in the Progress Notes associated with plaintiff's assessment at SCI-Waymart's Special Assessment Unit. These documents are also confidential and can be submitted *in toto* to the court for an *in camera* review. In order to protect the confidentiality of this document and the candor of the author, and prevent the plaintiff from using information in the document to feign mental illness, the government documents privilege is

9

other cases. The Defendants moved to revoke plaintiff's *in forma pauperis* status. Plaintiff does not possess the funds to pay the filing fee in this case. Absent his improper *in forma pauperis* application, plaintiff would not have been able to file this suit. It would be an abuse of the court's power to grant his Motion in a suit that he could not have filed in the first place absent plaintiff's improper *in forma pauperis* application.

II.  <u>Plaintiff Motion Should Be Denied Because He Never Served Defendants</u>.

Plaintiff never served defendants. Plaintiff claims to have served defendants on August 18, 2000. *See* Proof of Service attached to Plaintiff's Motion. Attached as Exhibit 9 in the Appendix to this brief is a print out recording transactions in plaintiff account. That account shows no transaction on or around August 18, 2000 for postage. The closest transaction is one on August 21, 2000 for $6.00. Plaintiff Motion was filed on August 24, 2000. Clearly, this transaction is for the original and copies of the Motion filed in court.[6] The Federal Rules of Civil Procedure and this Court's Local Rules require service. *See* Federal Rule of Civil Procedure 5(a) and Local Rule 7.2, USDC, M.D. Pa. "The enforcement of these rules and of the local rules is a role for a judicial officer." Fed.R.Civ.P. 5, Advisory Committee Notes for 1991 Amendment. This Court should enforce these rules by denied plaintiff's Motion.

III.  <u>Plaintiff Motion Should Be Denied Because He Sues The Wrong Defendants</u>.

Plaintiff seeks an injunction concerning his transfer. Transfer of inmates is a decision made by the Pennsylvania Department of Corrections ("Department"). No one Superintendent

---

asserted as to their full release.

6 Defendants weighed a copy of plaintiff's Motion obtained from the court at it weighed 4.65 ounces. The court can take judicial notice of the postage rates: first ounce costs $.33 to mail, remaining ounces would cost $.22 per ounces. This would yield a total postage of $3.18. Three times this number would approximate the $8.00 in postage plaintiff incurred on August 21, 2000. The $2.53 incurred on August 23, 2000 would at most equal the mailing cost of one copy

10

can transfer an inmate since the Superintendent of the institution receiving the inmate must accept the transfer. The coordination of these decisions is a matter for the Department as a whole. Plaintiff has not sued the Department or its administrators. Thus, he cannot obtain the relief he seeks. Since neither the Department nor its administrators are defendants, the court lack jurisdiction to order the relief plaintiff seeks. *See generally Ayres v. Jacobs & Crumplar*, 99 F.3d 565 (3d Cir. 1996).

### III. Plaintiff Failed To Show Exhaustion Of His Administrative Remedies.

"As amended by the PLRA, [42 U.S.C.] § 1997e(a) provides that '[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.'" *Booth v. Churner, C.O.*, 206 F.3d 289 (3rd Cir. 2000). Exhaustion means using all available administrative remedies, including all levels of appeal. "[T] PLRA amended § 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory – whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action." *Nyhuis v. Reno*, 204 F.3d 65 (3d Cir. 2000) And, the Department of Corrections grievance procedures qualify as administrative remedies within the meaning of the PLRA. *Booth v. Churner, C.O., supra.* Plaintiff fails to allege he fully exhausted all his administrative remedies prior to filing this motion. This bars the relief he seeks.

### III. Plaintiff Has No Right To Placement At Any Particular Correctional Institution.

An inmate does not have a right under the U.S. Constitution or the laws and regulations of Pennsylvania to any specific custody status. *Olim v. Wakinakona*, 461 U.S. 238, 245, 103 S.

---

and it is well after the August 18, 2000 service date that plaintiff claim in his Proof of Service.

Ct. 1741, 1745 (1983); *Oden v. Caison*, 892 F. Supp. 111 (E.D. Pa. 1995). Furthermore, pursuant to 37 Pa. Code § 93.11, an inmate does not have the right to be housed in a particular institution or in a particular part of an institution. In addition, prison officials have discretion to transfer prisoners for whatever reason or for no reason. There is no right to remain in a particular prison. *Olim*, 461 U.S. at 247, 103 S. Ct. at 1747. *Accord, Young v. Quinlan*, 960 F.2d 351, 358, n. 16 ("an inmate has no reasonable expectation that he will be incarcerated in a particular prison.), and the cases cited therein.

Plaintiff's suit seeks exactly what he has no right to achieve, placement in a particular institution, a state hospital, or a particular place in an institution, a special needs unit. Transfer decisions are one of the most critical decisions within the discretion of the Pennsylvania Department of Corrections. The make-up of a prison population is directly related to security concerns. In Jae's case, he clearly has a history of assaults and threats on staff. To place control over his placement in his hand, via the injunction he seeks, displaces the reasoned judgment of the Department and its trained staff. Here, as shown above, they have determined that plaintiff is best placed in a special management unit. To overturn such a decision based upon nothing more than an inmate's affidavit would be a gross abuse of this court's power and discretion.

III.    Plaintiff's Motion Is Nothing More Than A Disagreement Over Treatment.

"A disagreement between the doctor and a plaintiff as to the medical diagnosis and treatment does not constitute deliberate indifference. *Douglas v. Hill*, No. CIV.A. 95-6497, 1996 WL 716278, *7 (E.D. Pa. Dec.6, 1996) (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 473 (3d Cir.1987))." *Bednar v. County of Schuylkill*, 29 F.Supp.2d 250, 253 (E.D. Pa. 1998). An inmate who has been treated, "albeit not entirely to his liking", cannot claim his constitutional rights had

been violated. *Farley v. Doe*, 840 F. Supp. 356, 357 (E.D. Pa. 1993). "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3rd Cir. 1987) (citations omitted). *See also Farmer v. Carlson*, 785 F. Supp. 1335, 1339 (M.D. Pa. 1988) ("the key question . . . is whether defendants have provided plaintiff with some type of treatment, regardless of whether it is what plaintiff desires.").

Plaintiff's suit is nothing more than this impermissible disagreement over medical treatment. Plaintiff, with no medical background, has diagnosed himself as having an organic brain disorder which results in a chemical imbalance which ultimately results in his misbehavior. It is a nice excuse and typical of the worst in today's population who refuse to accept responsibility for their actions. Unfortunately for plaintiff, his doctors disagree with him. As shown above, after exhaustive examinations, they ruled out plaintiff's contention that his alleged childhood trauma is the cause of his misconduct in prison. This Court has no expertise in the field of psychology and cannot on the basis of nothing more than plaintiff's allegations overturn the determination by trained medical professionals. Those professionals determined that the best course of treatment for plaintiff was his placement in a special management unit. Plaintiff disagrees and believes he should be placed in a state hospital or a special needs unit. Plaintiff has no medical degrees, no professed medical education and no sustainable basis for his self-diagnosis and proposed treatment plan. On plaintiff's showing, this Court cannot, under the above-cited precedent, intervene and overturn the decision of reasoned, medical professionals. The Corrections Defendants are entitled to rely on the judgment of these medical professionals. *Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993).

IV.     Plaintiff Misconduct Determination Cannot Be Brought Under 42 U.S.C. § 1983.

Plaintiff in his Motion seeks release from the RHU. Essentially his suit is a wholesale challenge to the substantive validity of his misconduct determinations. The Court rejected such attempts to use Section 1983, even if the substantive appeal of the misconduct determination is only by implication. *Edwards v. Balisok*, 520 U.S. 641, 117 S.Ct. 1584 (1997). *See also Hanrahan v. Lane*, 747 F.2d 1137, 1140-41 (7th Cir. 1984); *Williams v. Smith*, 781 F.2d 319, 324 (2nd Cir. 1986). Plaintiff, therefore, cannot in this suit seek to overturn his misconduct determinations and escape from the sanctions imposed, confinement in the RHU. In addition, *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293 (1995), holds that plaintiff has no liberty interest that he can pursue in this case. Thus, plaintiff has no legal basis to proceed on his Motion.

V.      Plaintiff Cannot Sustain His Burden To Obtain Injunctive Relief.

The standards governing consideration of temporary or preliminary injunctive relief are well-established. An individual or party seeking a preliminary injunction must establish:

(1)     A reasonable probability of eventual success on the merits of the action;

(2)     A showing that the moving party will be irreparably harmed by denying injunctive relief;

(3)     A showing of no adverse impact upon other parties interested in the proceedings; and

(4)     A showing that injunctive relief would serve the public interest.

*Alessi v Pa. Department of Public Welfare*, 893 F.2d 1444 (3d Cir. 1990).

The foregoing shows that plaintiff has little or no likelihood of success on the merits.

14

There is no allegation of irreparable harm. The adverse impact on defendants and the Department would be immeasurable. Finally, the public interest commands that the court not interfere with the administration of the Commonwealth's prisons.

## CONCLUSION

**WHEREFORE**, in light of the foregoing, Correction Defendants respectfully request that the court deny Plaintiff's Motion and revoke his *in forma pauperis* status.

Respectfully submitted,

ROBERT M. WOLFF
Assistant Counsel
Attorney I.D. No. 42798
Counsel for Corrections Defendants

Pennsylvania Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA 17011
Telephone No. (717) 731-0444

Dated: October 10, 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN RICHARD JAE, | : | |
| Plaintiff | : | Civil Action No. 1:00-CV-1090 |
| v. | : | (Chief Judge Rambo) |
| DR. ROBERT CLARK, *et al.*, | : | (Magistrate Judge Smyser) |
| Defendants | : | |

## CERTIFICATE OF SERVICE

I hereby certify that I am this day serving a true and correct copy of the foregoing CORRECTIONS DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR AN EXPEDITED PRELIMINARY INJUNCTION upon the person(s) in the manner indicated below.

Service by first-class mail
addressed as follows:

John Richard Jae, BQ-3219
SCI – Camp Hill
P.O. Box 200
Camp Hill, PA 17001-0200

_____
Robert M. Wolff
Assistant Counsel
Attorney I.D. No. 42798

Pennsylvania Department of Corrections
55 Utley Drive
Camp Hill, Pa 17011
(717) 731-0444

Dated:  October 10, 2000