IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JUDGE'S COPY

JOHN RICHARD JAE

    Plaintiff,

    VS.

DR. ROBERT CLARK,
MARTIN L. DRAGOVICH,
JOHN A. PALAKOVICH,
ROBERT N. NOVOTNEY,
MICHAEL S. KAZOR and
JOHN ANDRADE,

    Defendants.

CRIM No. 1=CL=00-109

U.S. DISTRICT Judge Rambo
Mag. State Judge Smyser

FILED
JAN 9 - 2001
PER_____
HARRISBURG, PA DEPUTY CLERK

PLAINTIFF'S EXHIBITS TO BRIEF IN OPPOSITION TO CORRECTIONAL
DEFENDANTS' MOTION TO REVOKE PLAINTIFF'S IN FORMA PAUPERIS
STATUS AND TO DEFER FILING OF RESPONSIVE PLEADING TO
PLAINTIFF'S AMENDED COMPLAINT

EXHIBIT 1    AFFIDAVIT IN SUPPORT OF PLAINTIFF'S BRIEF IN
OPPOSITION TO CORRECTIONS DEFENDANTS' MOTION TO REVOKE
PLAINTIFF'S IN FORMA PAUPERIS STATUS AND TO
DEFER FILING OF RESPONSIVE PLEADING TO PLAINTIFF'S
AMENDED COMPLAINT

EXHIBIT 2    RELEVANT PORTIONS OF PLAINTIFF'S CRIMINAL
SENTENCING HEARING TRANSCRIPTS OF OCTOBER
1991, BEFORE THE HON. JOSEPH H. RIDGE JUDGE, ALLEGHENY
COUNTY COURT OF COMMON PLEAS CRIMINAL DIVISION
CC No. 9013134

RESPECTFULLY SUBMITTED

(S) ___John Richard Jae___

MR. JOHN RICHARD JAE
#BQ-3919
SCI-GREENE, EMU
175 PROGRESS DRIVE
Waynesburg, PA 15370

Dated: 30th DECEMBER 2000

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
Harrisburg Division

JOHN RICHARD JAE,
            Plaintiff,

      vs.

DR. ROBERT CLARK,
MARTIN L. DRAGOVICH,
JOHN A. PALAKOVICH,
ROBERT N. NOVOTNEY, MICHAEL
S. KAZOR and JOHN ANDRADE,
            Defendants.

CIVIL No. 1:CV-00-10
U.S. DISTRICT Judge Rai
Magistrate Judge Smy

AFFIDAVIT IN SUPPORT OF PLAINTIFF'S BRIEF
IN OPPOSITION TO DEFENDANTS' MOTIONS TO REVOKE
PLAINTIFF'S INFORMA PAUPERIS STATUS AND TO
DEFER FILING OF RESPONSIVE PLEADING TO PLAINTIFF'S
AMENDED COMPLAINT

      JOHN RICHARD JAE, hereby declares & swears
under penalty of perjury, that:

   1.   I am the plaintiff & Pro Se counsel herein the
above—entitled Civil Rights Action. I make this
sworn affidavit in support of PLAINTIFF'S BRIEF IN OPP
OPPOSITION TO Defendants' MOTIONS TO REVOKE Plaintiff's
Forma Pauperis Status And To Defer Filing OF Responsive PLEADING TO PLAINTIFF
Amended Complaint, herein this case.

   2.   As set forth in the Complaint & Amended Complaint herein this

I was placed in steel handcuffs, a black box and a steel waistchain with a padlock in my cell in the RHU at SCI-Camp Hill and such was done without Defendant Dr. Clark, Chief Psychiatrist, personally first examining seeing and talking to me to verify & determine that it was absolutely necessary to do such to me here.

3. That, Defendant Dr. Robert Clark, Chief Psychiatrist, left me in such steel handcuffs, Black Box and steel waist chain with a padlock, without ever seeing, talking non-evaluating me at all for four (4) days, from April 24, 2000, at which date he ordered the above removed from me.

4. That, the initial & continued placement of myself in steel handcuffs, a Black Box, and a steel waist chain a padlock here from April 24-27, 2000, was done for punitive purposes to punish me for my behavior, such was not the least restrictive measure which have been used here and such amounts to inhuman treatment.

5. That, as a direct result of my being placed steel handcuffs, a Black Box, a steel waist chain and by Defendant Dr. Clark, from breakfast on April 24 thru lunch, on April 27, 2000, Plaintiff Joe, was eat normally & had to stick my mouth down in my and drink and eat/drink it like a dog, which not only humiliating, but was really difficult to do.

6. That, as a direct result of my being placed and left in steel h Black Box, a steel waist chain and a padlock, by Defendant D

7. That, as a direct result of my being placed & left in steel Hand cuffs, a Black Box, a steel waist chain and a Padlock, by Defendant DR. Robert Clark, from April 24-27 2000, I had extreme difficulty urinating and did not move my bowels at all because I could not wipe myself & most times wound up peeing all over myself when I did urinate, which was not only humiliating, but extremely uncomfortable as he had to remain in wet, pissy undershorts. also as a direct result of my being placed & left in steel Hand cuffs, a Black Box, a steel waist chain and a Pad lock, by Defendant DR. Clark, from April 24-27, 2000, I suffered extreme, unnecessary mental and physical pain, anguish and torture to my hands, arms & shoulders & permanent injury by way of scars on both of my wrists from the steel Hand cuffs and I will be scarred / marked for life from such and I suffered with no feeling in my left hand, from right below my wrist to the base of my left thumb & such felt dead for over 3 months.

8. That, despite my attempts to take my life on April 23, & 24, 2000, & despite a prior mental health illness relapse back on February 15, 2000, and February 16, 2000 where I rubbed feces all over my face, hair, arms, hands, legs & on his cell wall & told Prison Staff that I was Jesus Christ & that little green men were running around my cell & trying to run up my ass & where I was banging my head off of my cell wall then too, Defendant DR. Clark to have me committed to a psychiatric facility mental health commitment & wantonly & deliberately refused to treat my mental health illness here at all-

9. That, I still hear voices in my head & still [have]
thoughts about killing myself from time to time [have]
since April 27, 2000, and I do believe that the next t[ime I]
try to kill myself I will do so for certain as I am sick of [it]

10. That, I have a long & lengthy past history of ser[ious]
mental health illness disease and I had been taking
different kinds of medi anti-psychotic medications [since]
1969, when I was Nine (9) years old up until January 1[2,]
1999, when I was taken off of anti-psychotic medicati[on]
by Defendant Dr. Clark, here, with the exception of a [short]
period of time from April, 1986 — May, 1987 when I w[as]
not on any medication at all & I have not been on any an[ti-]
psychotic medication here since January 12, 1999, and I
want to get help and treatment for my serious men[tal]
health illness disease and I have requested such f[rom]
Defendant Dr. Clark and other Prison Staff here, but [I]
have been denied such help and treatment by Defendant
Dr. Clark and Prison Staff here.

11. That, on November 19, 1999, Plaintiff Jae was initial[ly]
placed in the Restricted Housing Unit ("RHU") at SCI-Cam[p]
and I have remained on Disciplinary Custody Status in the [RHU]
since November 22, 1999.

12. That, on or about February 17, 2000, February 24, 2000, A[pril]
25 & 27, 2000, May 4, 2000, May 31, 2000, & June 5, 2000,
Defendant Andrade found me guilty of various Prison Misconduct[s]
which were a part and a product and a direct result of my [serious]
mental health illness disease and he sanctioned me to
Disciplinary Custody Status time in the RHU for such

18. On: June 6, 2000, after I had arrived in the Restric[tive] Housing Unit ("RHU") at SCI-Waymart[1] and was given my fir[st] Interview with the SAU Treatment Team there.

19. On: June 6, 2000, during such same above-referenced Interview, the SAU Treatment Team then verbally tol[d] & promised this plaintiff that the one thing that w[as] they were "not" going to recomend that I be placed [upon] a Special Management Unit (SMU) due to my plainti[ff's] history of serious Mental Health Illness Disease[s]

20. That, obviously they were "lying" when they stated [and] promised me the above, as in the end they did recom[end] such placement.

21. The Suicide Risk Indicators Checklist For RHU/S[MU] that was done on this plaintiff on 6/6/00 was done by a mere R[HU] officer, who [has] no psychiatric/mental health training /nor schooling and is/was "not" qualified/competent to do so and/or to assess my potential risk of committing sui[cide] and given such, such Suicide Risk Indicators Checklist Fo[r] RHU/SMU, (Corrections Defendants' Exhibit __2__ of the[ir] Appendix "B" Corrections Defendants' Supplemental Brief In Sup[port] of Motion To Revoke Plaintiff's In Forma Pauperis Status An[d] To Defer Filing of Responsive Pleading[s to] Plaintiff's Amen[ded] Complaint, herein) "is" unreliable and thus by law, must "no[t]" be considered by this Court, herein this case.

22. That, contrary to the Mental Health Records, which Cor[rections] Defendants submit in their Appendix "B" Corrections Defendants' Supplemental Brief In Support of Motion To Revo[ke]

1 / Although the plaintiff was under the authority of the SAU Team he w[as] still upon [...]

Plaintiff's In Forma Pauperis Status And To Defer Filing of
Responsive Pleading, herein, plaintiff Jae avers & submits
that, he did "not" tell the staff in the SAU/RHU at
SCI-Waymart that he would be staying here at SCI-
Waymart for a long time and would most likely get
committed to the forensic unit and this "lie" & out and
out deliberate and malicious "lie" by the unqualified
and unprofessional "SCI" ▓▓▓▓▓ psychiatrist in the
SAU at SCI-Waymart and/or by the Correction staff there.
● I never said such to anybody at all, and, as such, such
unreliable evidence, which plaintiff challenges the exact
/authenticity of and which this court ● must "not" consider.
     Furthermore, why would plaintiff seek to be classified
as mentally ill by SAU Mental Health Treatment Staff when
he had already years ago been classified as such, &
although he did voice his desire to be transferred to the
Intermediate Care Unit at SCI-Waymart, ● he did so because
he had been told that this could occur by Dr. Ruby, chief
psychologist and SAU Treatment Team Leader and by his SAU
Counselor/Treatment Team Member Mr. Burke at SCI-Waymart,
and because he did want out of his illegal confinement in
the RHU on punitive segregation/DC-status where by law
he is not permitted to be confined at due to his significant
history of serious mental health illness disease, and
because he did not want to be subject to further illegal
confinement in a Prison's Special Management Unit ("SMU")

2) I challenge Dr. Ramon's qualifications as a psychiatrist in his
Brief In Opposition To Defendants' Motions To Revoke Plaintiff's In Forma
Pauperis Status And To Defer Filing Of Responsive Pleading To Plaintiff's
Amended Complaint, submitted with this Affidavit, herein, in this case, &
3) I challenge the authenticity of Corrections Defendants' Exhibit "C" in

and I do "not" use (or even like to use) the excuse of having
a mental illness as a reason and rationale for my behavior
problems which I have exhibit prior to my transfer to
at SCI Waymart or for the behavior problems which occurred
while I was in the SAU/RHU at SCI-Waymart, as such
behavior problems were/are a direct result of & a part/product
of my genious mental health illness disease and as
such had already been determined to be true, long time
ago by psychiatrists (neuropsychiatrists/forensic
psychiatrists) who were/are way, way far more qualified
than the "nigger" and the "spic" (defendant Dr. Clark
and SAU/Waymart's Dr. Ramon) that the corrections
defendants use/rely upon, herein this case, and thus the
corrections defendants' exhibits and evidence and the
diagnosises/opinions of Clark and Ramon "are" specially/
factually frivolous & unreliable And should "not" be considered
by this court, herein this case, or at least must be considered
with a healthy dose of skepticism as to their believability/reliability
herein

23. That, Dr. Ramon and the SCI-Waymart SAU Treatment
team "did" make their diagnosises and determination that
the plaintiff had no gross organic impairment which would
account for my numerous misconducts, numerous assaults
prior to incarceration and my behavior without waiting for
the test results/report to come back from the EEG/Brain
Wave test done on me by the order of Dr. Ramon at Waymart and without
waiting for the MRI test which Dr. Ramon had ordered done on my
head/brain to be done & for such to come back, and which

3-Cont'd/Brief In Opposition To Defendants' Motions To Revoke Plaintiff's
In Forma Pauperis Status And To Defer Filing Of
Responsive Pleading To Plaintiff's Amended Complaint Until the

really qualified competent professional ▮ psychiatrist/men
health professional would ever make such diagnosis
/finding of no gross organic impairment without such tes
results/report completed & reviewed 4/and especially not
when they were aware that the patient had already
previously been determined to have such organic impair
due to a head injury which resulted in minimal brain
damage to the patient, as DR. Ramos and the SAU
treatment team <u>were</u> aware of with myself, as I ha
personally told them about such and such was in m
prison mental health records anyhow, and thus, their
SAU Treatment Team's diagnosis, determination, report
recomendation "<u>was</u>" based on insufficient evidence
/information, "<u>was</u>" premature/made too early and "<u>is</u>"
totally worthless and unreliable herein and ▮▮ DR. Ramos
the SAU treatment team are "<u>not</u>" highly trained r
qualified mental health professionals at all.

24. On July 18 2000, plaintiff Jae was transferred ba
to SCI-Camp Hill RHU from the RHU/SAU at SCI-Way

25. On Octoeber 24, 2000, I was transfered to the
Special Management Unit (SMU) at SCI-Greene se
of the report and recommendation of the SCI-Waymart S
Treatment Team. 5/

26. On November 1, 2000, the Psychiatric      R
team here at SCI-Greene met and discussed my case
On November 2, 2000, MR. Kolko, (my psychologist here als
who was present at such meeting) told me that such Tea
that I had been unfairly dumped here and that there would
attempt made to have me transfered to the Intermediate Car
4/ Apparent DR. Ramos felt that such EEG and MRI tests were impa

SCI-Waymart on to some other step down unit, but ar[e] of the SMU here.

27. Additionally, and although I did not state such in my Initial nor Amended Complaints, herein this case, back [in] 1966, my Father knocked me down a flight of steps in a drunken rage & I struck/hit the back of my head & wa[s] knocked unconscious for between 5-10 minutes & as a direct result thereof, I suffered severe & graphic head-trauma and I have M.B.D. (Minimal Brain Damage) and back in 19[ ] or 1993, I was informed by a consulting psychiatrist from the University of Pittsburgh's Western Psychia[tric] Institute And Clinic, DR. Scott Burstein, (a neurolog[ist] who had built his practice on treating individuals with psychiatric disorders stemming from neurological damage) & who was one of my treating psychiatrists at the State Correctional Institution At Pittsburgh's Special Needs Unit (i.e. SNU") my acting out physical behavior and my sexual misconduct Behavior are a part of and a direct result of such head Injury which I suffered back in 1966 and that if such Injury, and the resulting minimal brain damage, had not occured, that I would not have prob[lems] with my physical acting out nor my sexual misconduct beh[avior] & that there is a chemical/neurological impairment/ imbalance in my Brain as a direct result of such 19[66] head Injury and the resulting minimal Brain damage, wh[ich] is what causes me to do so. Also, it is very strange tha[t] only psychiatrist who say I don't have mental illness disea[se] & I am just a behavior problem, are Defendant Dr. Clark and Dr. Ramon[ ]

a) Facts that they were all aware that I had a Motion for Temporary Res[training] And/or An Expedited Preliminary Injunction for an Order Restraining/Enjoining[ ] From sending me t- an SNU pending before this court herein this case, which t[ ] [ ]ulded not ruled on yet [ ]

such is what the prison officials want them to say, however, the psychiatrists who have examined me outside of and before I came to prison, (one of whom was still seeing me in prison back in May & 1995, at CCI-Pittsburgh), who are the specialized psychiatrists (i.e., Forensic psychiatrists, neuropsychiatrist) (one of such is also the Director of the Allegheny County Forensic Behavior Clinic and the main psychiatrist for the Allegheny County Court of Common Pleas, Criminal Division, Dr. Christine Martone), all state I  "do" have and suffer from serious mental health illness disease, "I" "do" have neurological damage to my brain and that my physical acting out behavior is a part and a product and a direct result of my serious mental health illness disease and it is such specialized psychiatrists who are the real qualified ones, not just mere plain psychiatrists that the prison hires, such as Defendant Dr. Clark and Dr. Ramon (the "indian" and the "spic" whom have got their psychiatric degrees out of a "Cracker Jack" Box.

28. At the time of the incidents alleged in my initial complaint I was suffering irreparable injury/harm and in imminent danger of serious physical and mental injury due to my suicide attempts/serious mental health illness disease, despite the two (2) separate recent suicide attempts, and in being denied any treatment at all for my serious mental health illness disease, despite my long & lengthy significant history of serious mental health illness disease, and under subhuman conditions, such where my prison cell has broken/inadequate plumbing, which causes the toilet/sewage water to come out into the cell on the cell floor which causes a constant foul odor in my cell & land on me and a couple time have even flown up to my mouth and I've gotten physically sick from such, where there is inadequate water, inadequate ventilation/excessive heat, where there is broken shower, where cockroaches, mice and other vermin run rampid throughout the cell & up in my cell & it is only a matter of time before I get bit & catch a disease

where I only got linen for my bed, a clean RH
jumpsuit to wear (which was usually too small f
me and/or had most (if not all) of the butta
missing from it and/or was ripped) and a cle
towel, once every few weeks; where there is exce

noise from certain other inmates, where other
inmates and prison officers would deliberately
maliciously tease, taunt and torment me becaus
my serious mental health illness disease and my
criminal sex offense; where prison officers wa
mess with my food; where prison officers would
threaten me with physical bodily harm and also ph
assault me and where I lived in daily fear of be
physically assaulted; and where my Pa-State an
United States Constitutional Rights and t
to have "adequate", "meaningful" and "unimpeded" acce
the courts/access to my legal materials, to ser
receive mail, to read books and magazines, t
outside exercise and showers and to be free
subjection to cruel and unusual punishment
violated on a repeative and continuous basis & give
I have went through just since last November 19,
it is a miracle of God that I haven't yet killed m
but I sincerely believe that the next time I

29. That, in sentencing me to my 10-20 yrs. prison sentence for my crim[...]
I DSI charges, my Pa. State Court Criminal case sentencing Judge, the Hon[...]
A. Ridge of the Allegheny County Court of Common Pleas, Criminal Division, stated the follow[...]

1] "The Court will, for what it's worth, recommend
that you serve your term of confinement at the
Fairview State Hospital, but the problem there is that that
is at best a recommendation. The responsibility for
determining the place of confinement is left
with the Department of Corrections. I do, however,
feel that they will at least have the benefit of
knowing how the court feels about it. It's an adequate
institution for those people who normally were
described as criminally insane, but it's for people who
suffer from mental health problems, who have
committed crimes against society for which they have been convicted." 1] 6/

30. That the Pa. Dept. of Corrections has never considered nor complied with the requ[...]

31. That once a person has a mental health illness disease pr[...]
and/or a head injury/maximal brain damage, such does not go away
always remains & this is here was confirmed to me by corrections
Defendants own SCI-Camp Hill Director of Psychology/Chief
Psychologist Mr. Klebe, when I verbally asked & questioned him about such on October
2000.

32. That in September 28, 2000, while was thru my boxes of legal materials in the Law library a cell
the RHU at SCI-Camp Hill, SCI-Camp Hill RHU officer Ragan discovered a
25 Napresyn & Benedryl Medication/Pills, which I had hidden in my legal pape[...]
in my cell property, and which I was saving up to take an overdose of & kill myself wi[...]

33. That, on November 29, 2000 my SCI-Greene SMU counselor?

Mr. Harris & I were talking at my cell, when unprompted Mr. Harris stated I do not belong in
34. That my psychologist here has told me that everyone here on the RHU [...]
(W)HEREFORE, based upon the above & foregoing, herein, g[...]
upon that stated & set forth in Plaintiff's Initial & Amended
6/ See Plaintiff's Exhibit -B-, of his Appendix to his Brief in
opposition to Defendants motion to re[...] Plaintiff's In Forma Pauperis

Complaints and In Plaintiff's Brief In opposition
corrections Defendants' Motion To Revoke Plaintiff's In
Forma Pauperis Status And To Defer Filing of Respons
Pleading To Plaintiff's Amended Complaint, herein this
Plaintiff "was" under imminent danger of serious physical in
at the time of the Incident(s) alleged In Plaintiff's
Initial Complaint, as he "was" suicidal & thus the Plaint
In Forma Pauperis Status should "not" be revoked herein this

Signed this  30th  day of December, 2000, under pen
of perjury & pursuant to 28 U.S.C. § 1746, that such I
true & correct.

RESPECTFULLY SUBMITTED.

(S)  _John Richard Jae_
MR. JOHN RICHARD JAE,
#BQ-3219
SCI~ Greene/SMU
175 Progress Drive
Waynesburg, PA. 15370
Plaintiff and Pro Se Counsel

Dated/Executed On:
30th December 2000.
At: Waynesburg, Pennsylvania.

8

BY MR. BARRETT:

Q    Would you state your name for the record, please.

A    My name is Christine Martone.  I'm a Physician

     licensed to practice in the State of Pennsylvania.

     I'm a board certified psychiatrist, and I am Director

     of the Allegheny County Behavior Clinic.

Q    And how long have you been so employed as a

     physician?

A    I've been with the Behavior Clinic since 1977.  I've

     been Director since 1986.

Q    And with regard to your licensing as a physician

     just in general, when were you first licensed as a

     physician?

               MR. MERRICK:  We'll stipulate to

          her expertise.

               MR. BARRETT:  Is that agreeable to

          the Court?

               THE COURT:  Yes.

               MR. BARRETT:  I know she is well

          familiar to both this Court and counsel.

               THE COURT:  Yes.

BY MR. BARRETT:

Q    Dr. Martone, in your professional capacity with the

     Behavior Clinic and with the Allegheny County Jail,

--- 9

did you have an opportunity to come in contact with

the Defendant in this action, Mr. John Jae?

A   Mr. John Jae is well known to me. I've been in con-

tact with him many times over the years.

Q   And that's not only with regard to this action but

also prior actions; is that correct?

A   That's correct.

Q   Have you had an opportunity to evaluate or to test

Mr. Jae to determine what, if any, emotional or

psychological difficulties he may be experiencing?

A   He has been evaluated not only by me, but by various

hospitals that he has been sent to.

Q   Have you had an opportunity with regard to the

various other hospitals to review the various

diagnos.e s or summaries of treatments and evaluations

that they have prepared and submitted?

A   Yes, I have.

Q   And have these been, in fact, returned to the

Allegheny County Jail at the request of your office?

A   Yes.

Q   Based upon your review of that medical evidence,

together with your own examination of the Defendant,

can you, within a reasonable degree of medical

certainty, offer an opinion to this Court as to any

---

diagnoses that the individual may have concerning

his condition?

A.   The most consistent diagnosis that John carries is

narcissistic personality disorder with explosive

seizures.

Q.   I will have to admit my ignorance to the psychologi-

cal diagnosis you just offered.  Would you give an

indication of the characteristics of such a

diagnosis?

A.   A personality disorder is not someone who is out of

contact with reality.  It is more a style of dealing

with life, in fact, a mal-adaptive style of dealing

with life.  These people have difficulty forming

meaningful relationships.  They tend to view every-

thing in black and white terms, all good or all bad,

all positive or all negative.  A slight disappoint-

ment is tanamount to rejection.  They tend to call

attention to themselves, constantly seeking approval

from others in order to bolster their own very weak

self concept.  Furthermore, they have a sense of

entitlement, things that are coming to them.

The explosive features speak to temper out-

bursts that occur periodically with these individuals

with a poor frustration tolerance.

---

Q.   Now with regard to the diagnosis you just offered,
     especially the explosive nature, when you are talk-
     ing about that, that does not necessarily mean, I
     assume, that the explosive would be aggressive or
     involve physical actions to another individual; it
     can be verbal; is that correct?

A.   It can be either.

Q.   Now with regard to the diagnosis you have indicated,
     are there any other secondary diagnoses that you are
     aware of?

A.   I don't have the full record with me.  There have
     been many that have been postulated, but at this
     point no other has been consistently put forward and
     proven.

Q.   With regard to an individual that has such a
     diagnosis, can that individual be most adequately
     addressed with regard to his needs in a correctional
     environment?

A.   Nobody can be adequately addressed in a correctional
     environment.  I think it would be a little easier
     if I could speak specifically about John.  In an
     individual such as John --

Q.   I would appreciate that.

A.   He would have a very difficult time in an institutio

--- 

1

2   setting, particularly one of incarceration.  I think

3   this has been proven by his record.  He really just

4   gets transferred back and forth from the disciplinary

5   housing unit to the mental housing unit.  I don't

6   think he ever maintains any time in general popu-

7   lation.  He's easily stimulated and provoked, and

8   he often gets hurt because he becomes then very

9   provocative to others.

10  Q   Would the individual perhaps be better treated in

11      a medical environment where he could receive treat-

12      ment and counseling with regard to his condition?

13  A   That is one of the difficulties.  There really is no

14      treatment for John.  I mean, I don't know that there

15      is anything that's really going to improve his

16      situation.  Certainly he's been in many institutions

17      and he has not improved.  The only thing I can say

18      is that he has a very difficult time in jail, in

19      the incarceration situation.

20  Q   With regard to management situations, would it be

21      better to manage his condition in a medical environ-

22      ment as opposed to a correctional environment?

23  A   You know, it really depends.  He has had difficult

24      times at the State hospitals also.  You know, this

25      is something that wax and wanes.

--- 13

Q   With regard to the individual, if he were sentenced
    to a period of incarceration in a correctional
    facility, would his behavior place him at a greater
    risk or jeopardy of injury with regard to the other
    individuals inside that prison population?

A   Oh, yes.  Absolutely.  He is at risk of being hurt
    by others, guards as well as inmates, because of his
    inability to control his own behavior.

Q   And in essence if he went to a correctional facility,
    essentially he would have to be in almost solitary
    confinement, from what you're telling me, to avoid
    the possibility of any injury?

A   At the jail we do not have him in solitary con-
    finement.  They manage him by either placing him
    in the disciplinary housing unit, which is individual
    cells, or in the mental health unit, which is again
    individual cells.  I don't know if he's ever made
    it to the select housing unit.  The FHU.

        He has.  That's a situation of individual
    cells.

        It's when he is in the general population that
    he has the greatest difficulty.

Q   Now with regard to the individual or any individual,
    whether it's Mr. Jae or someone else, would you have

64

this County to take you to the State
Correctional Institution at Pittsburgh for
purposes of classification and assignment.
Now, that classification process takes
approximately 8 weeks by my best infor-
mation.  They will, of course, be aware
of your mental status, your problems there.
The Court will, for what its worth,
recommend that you serve your term of
confinement at the Farview State Hospital,
but the problem there is that that is at
best a recommendation.  The responsibility
for determining the place of confinement
is left with the Department of Corrections.
I do, however, feel that they will at
least have that benefit from knowing how
the Court feels about it.  It's an adequate
institution for those people who formerly
were described as criminally insane but
is for people who suffer from mental
health problems who have committed crimes
against society for which they have been
convicted.

Now, that's your sentence.  Do you